FITCH, Appellant, *v.* BROCKMON, Sheriff, Respondent.

M. B. C. contracted with the owner of a ranch, to take the ranch under his charge, and take care of it to the best of his ability, &c., and the owner stipulated in recompense of his services, and to cover his expenses, to give him one-fourth part of all the increase of the cattle, &c., upon the ranch, when parted at the end of five years. M. B. C. assigned his contract to L. C., against whom a judgment was obtained, and execution issued to the sheriff, who levied upon and sold a portion of the cattle upon the ranch, then claimed by the widow of the said owner, who had died in the mean time; the five years to which the contract was limited having expired, the widow brought trespass against the sheriff for the cattle thus levied upon and sold.

Held, 1st. That the questions asked by the plaintiff, which might have produced answers showing acts of ownership on the part of the plaintiff, and tending to prove her possession of the property (which was disputed), was evidence, and should not have been excluded.

2d. That the true construction of the contract gave no present interest in the live stock to M. B. C., but only to acquire a determinate interest, after the performance of all the stipulations on his part, and that these could not be completed until the expiration of five years from the execution of the contract.

3d. That the undertaking on the part of M. B. C. was strictly personal, the result of the owner's confidence in his skill, &c., and its spirit and meaning was that no other should be substituted in his place.

4th. That the assignee of M. B. C. had no right whatever in the cattle which could be made the subject of a levy and sale.

APPEAL from the District Court of the Seventh Judicial District.

This case was brought before this court at October Term, 1852, and will be found reported, 2 Cal. Rep. 575, when the judgment of the District Court was reversed, and the case remanded. It was again placed for trial at the November Term, 1852, of the District Court, and was tried by a jury, who, on the 30th November, found a verdict for the defendant, and judgment was rendered against plaintiff for costs. Plaintiff asked for a new trial, which was refused by the court below. Plaintiff appealed, and again brought the case into this court.

The pleadings will be found, 2 Cal. Rep. 578. The action was for the recovery of the value of certain cattle, the property of the plaintiff, alleged to have been seized and driven off by the defendant.

The defendant answered, and denied the allegations of the complaint, and further answered that the cattle were the property of one Lindsey Carson; that defendant was sheriff, and had placed in his hands an execution against Carson, in virtue whereof, he had levied on the cattle and sold the same, &c., and was authorized so to do by the agent of the plaintiff.

A jury being sworn, Henry Fitch was sworn on the part of the plaintiff, and testified, I am son of plaintiff; mother, resided on Sotoyome Ranch, with the family, in May, 1851. Father, Henry D. Fitch, died, January, 1849. I was on the ranch when defendant came there with Pierpont and five or six others. Defendant asked me if the cattle I was driving to corral, were for him. I said not. He said he was after cattle. I told him there were no cattle there for him. I heard, next day, the cattle were gone. Witness then went in pursuit of them, and saw defendant, who told him he had taken the cattle. Witness pursued them further, and found them in possession of Long, branded with the letters H. F., his father's brand. Long claimed them, and forbid witness from driving them away, and threatened force. He also gave evidence of the value, &c., of the cattle, described the brand as their brand, and otherwise identified the cattle as those he was in search of, and proceeded to say :—

Mother moved on the ranch in the spring of 1851, in April. Moses Carson had not been on the ranch for some months. We lived in the old ranch house; not the same Moses Carson had lived in. I was there some time before moving, to take care of the stock, as Carson was not there. Brother William was there; mother sent him. We were the only ones who took care of the ranch for about a year before the family moved. The cattle were branded by myself and William, with the help we hired. Mother directed me to hire. I hired as her agent; she furnished the means. We corralled the cattle during the time we were with them, in 1850 and '51.

Question by plaintiff. During the year 1850, was the ranch improved? Defendant objected. Question sustained, and plaintiff excepted.

I think no one took charge of the cattle while we were on the

ranch, except ourselves, and those under our control; and we kept control till mother took possession, in the spring of 1851. They tried to get possession by force, but we stopped that.

Question by plaintiff. Was any portion of the ranch cultivated in 1851, before the taking of the cattle?

A portion was cultivated by us, under mother's direction. We raised crops, ploughed with the same oxen taken by defendant. Some of the old cows and steers that were taken, were the same that father had turned over to Moses Carson; the oxen were also the same. (The witness testified to a great many other facts, showing ownership of the cattle, unnecessary to report, and also to the possession of the ranch by his mother and the family from 1851, under whose direction he acted throughout.)

On cross-examination, defendant asked the witness, How did you, your mother, and Henry, transact the business of the ranch, before and since the taking of the cattle, as executors of your father's will?

Answer. I don't know that any one acted as executor before the taking. Since the taking, we have acted under mother's directions, as executors, on the ranch. The cattle taken belonged to the estate of my father. We made a final settlement with Lindsey Carson in the fall or summer of 1851. I was not present when the settlement was made. In the absence of my mother, I did the business of the ranch, whilst I was there. I was absent in the winter of 1850 and '51. The cattle sold to Combs, was by mother's order. Lindsey Carson lived on a piece of ground three miles from our house.

Plaintiff here introduced a contract between Henry D. Fitch and Moses Carson (Exhibit A), which stipulates as follows:—

(*Translation from the Spanish.*)

1st. This contract is to be in force for the term of five years.

2d. I, Joseph M. Carson, of my part, do make myself accountable, and oblige myself to take under my charge, the rancho of Mr. Henry D. Fitch, known by the name of Sotoyome, in Sonoma, to be taken care of to the best of my intelligence and knowledge, for its better protection and forwardness.

3d. Agrees to pay all wages of servants, and for utensils for the work, which shall be my property.

4th. The provisions shall be taken from the produce of the rancho.

5th. I, Henry Fitch, on my part, hold myself responsible to deliver said rancho of Sotoyome, in the month of October, to Mr. Joseph M. Carson, with all the cattle, horses, sheep, &c., that may be found on the rancho in the aforementioned month, and this contract shall be considered good, and carried into effect from the same date.

6th. In recompense for the services of the said J. M. Carson, and to cover expenses that he incurs, I oblige and compromise myself to give him one-fourth part of all the increase of the cattle and breeding mares, and two-thirds of all the grain raised, of whatever class it may be.

7th. Of the sheep, I, Henry D. Fitch, agree to give him, J. M. Carson, one-third part of the increase.

8th. There shall be built, a manufactory of serapes, woollen cloths, and blankets, the expenses of which will be paid by J. M. Carson, and one-third of all the products shall be given to Henry D. Fitch, free of charge.

9th. The before mentioned J. M. Carson shall have his branding iron apart, as we have agreed upon.

10th. At the end of five years, I, Henry D. Fitch, on my part, do agree, in sign of my esteem, to deed him a piece of land of said rancho of Sotoyome, of two hundred acres, English measure, over and above what I have promised to give him for his personal benefit and good, and also of his family and heirs in a direct line, without being able to sell it or transfer it.

12th. In case that H. D. Fitch wishes at any time to place another individual on the rancho, to cultivate the land, or manufacture of any kind, he shall be able to do so independently of the other stipulations, with the only exception of raising other stock, &c.; and Mr. Joseph M. Carson agrees to this condition.

And to the well fulfilling of this contract, both parties promise and bind themselves, with their personal goods that they have or may have, renouncing all law in them forever, consider-

ing the present as valid as if it were judicial, with all the requisites that the law demands, signing two copies of the same tenor, and before two witnesses, and on common paper for want of stamped.    San Gabriel, June 30th, 1840.    Defective sheep not counted.

Witnesses,                                      H. D. FITCH,
    P. HUGO REID,                         M. B. CARSON.*
    ZELEPA REID.

N.B. We have mutually agreed to remit the ninth article. There shall be only one branding iron on the rancho ; that shall belong to H. D. Fitch till the goods are parted, at the end of the five years; and in testimony, we sign it on the same day.

H. D. FITCH,
M. B. CARSON.

The foregoing instrument was originally written in Spanish. The translation, as above, is found upon the record.

Henry Fitch, a son of plaintiff, testified that he had seen the cattle sold in Sonoma.    They were not in view of those attending the sale, but were thirty miles off.    They were taken from the ranch after the sale.    M. Pierpont purchased 200 head.    The sale was for so many cattle running on the ranch, and not of any particular lot.

The plaintiff offered to prove that the whole cattle were sold, and not an undivided interest.    Defendant objected, and the offer was sustained, and exception taken by defendant.

I went on the ranch with mother, who had the charge of the whole affairs of ranch and cattle.    Vacquerios were employed from time to time, by mother, and paid by her.    She employed, and payed the charges down.    All help was employed and paid by mother.    The corral built by those employed by her.    There was no cattle on the ranch with the brand of Lindsey Carson. Those taken, had it not.    Mother owned the horses that the vacquerios rode.    She bought 40 or 50 in the fall of 1850.    I know no person on the ranch, taking care of it, who was not in

---

* In the translation, the name signed *M. B. Carson* is written *I. M. Carson*, which seems to be an error.    It is, however, taken from the record as it appeared.

mother's employ.   Moses B. Carson sent to mother to come and take possession of the ranch, in the fall of 1850; she went accordingly.   I saw M. B. Carson exercise no act of ownership after she went there.   I saw the rodio when 295 head, sold to Chiles, were taken.   Moses and Lindsey were present.   Moses went to the States in 1850.   Lindsey came to me for a rodio, and I objected at first, but afterwards ordered the major domo to make one.   I acted for my mother.

Question by plaintiff.   "Had the branding been so neglected, that Mrs. Fitch had to brand some of the old cattle in the spring of 1850 ?"   Objected to, and sustained.   Exception by plaintiff.

Lindsey Carson came to me for permission to milk some cows, in 1851.   I heard him forbid the delivery of the cattle after the sale on execution.   He claimed that the sale was *illegal*.   At the time of settlement, L. C. said he would make us responsible for the cattle.   We gave him 600 head on settlement.   He was not charged with the cattle taken by the defendant.

Question by plaintiff.   "Who paid taxes on the ranch and stock in 1850 and 1851?"   Objection by defendant.   Sustained, and exception by plaintiff.

There was an understanding by Pierpoint and me to buy 200 head of the cattle sold by Brockmon, and we did so.   Afterwards I bought Pierpoint's share, and they never were taken from the ranch.   Mother was not on the ranch in December, 1850.   While I was on the ranch with William, in mother's absence, I was most in charge.   In her absence I disposed of a small lot of stock. She was absent at the time of the sale.   I could not say she left me as her agent.   I did not so say at the time of sale or on the previous trial.

Question by defendant.   Did you, at the sale, say you would deliver the cattle sold to the buyer?   Objected to by plaintiff. Overruled.   Plaintiff excepts.   Answer.—I did say so, but that would not make it so.

There never was any regular delivery of things from Carson. I suppose the cattle were the property of H. D. Fitch, deceased. There had never been any division of the estate at the time of taking.

Question.   Have you, in connection with your mother and

23

Frederick, acted as executor before the sale? Objected to by plaintiff. Overruled. Plaintiff excepts. Answer.—I have with my mother, but do not know as to Frederick.

I sold about 180 head when mother was gone, and received the pay. Mother received a part when she came back. I attended all rodios, and took general charge. Moses Carson was not at the ranch when the cattle were delivered to Chiles. I signed, with mother, on the settlement. I was not present at all the conversation on settlement. I was of age in June, 1851. Not of age at the time of sale. There was some action taken on father's will in 1849. I never gave any bonds. I acted under my mother in my acts on the farm. Mother received the money for the cattle sold. I paid to her when I received money. She made the sales when at home. I was present when Brockmon came for cattle, and mother forbid his taking them, and said she did not know whether Carson had 1 or 1000 head, and that Carson had said he would hold her responsible.

Plaintiff offered to prove that Pierpoint went with defendant at the time the cattle were taken; and after the conversation between plaintiff and defendant, Pierpoint told defendant he had no right to take the cattle, and defendant said he should take them.

Objected by defendant. Objection sustained. Exception by plaintiff. I never signed myself as executor before sale. I was merely the agent of my mother. That is what I meant when I said I was executor.

The plaintiff also proved by Bijou, the major domo, that he had been hired by her, and went on the ranch in August, 1850, and had lived there till the present time. That Mrs. Fitch had paid him, and he was employed generally in tillage and in looking after the cattle. Six vacquerios were on the ranch when he went there, one of whom had been in the employ of Moses Carson; all were employed by Mrs. F. after witness went there. The horses were branded with the iron of Henry D. Fitch. Moses Carson told me he had sent word to Mrs. Fitch that he wanted to deliver up the possession of the ranch. After I arrived I never saw Moses Carson take any charge of the ranch or cattle, or give any orders. A rodio was made when the 295 cattle were delivered

to Chiles.  I made it by Henry's order.  Lindsey Carson asked me to make a rodio, and afterwards Moses came, but I would not do it.  They wanted it in order to get the cattle.  I told them I would not without an order from Mrs. Fitch.  Moses then brought a written order from Henry; and Henry came and ordered it.  Lindsey Carson never took any charge of the cattle. I know the cattle Brockmon took away.  They had been corralled about two weeks before, and ran distant from the house from 100 varas to two and a half miles, and were part of a herd of about 600.  I saw them all; they were taken at Vacos.  I went there with Fred.  I counted them three times, oxen, cows, and other cattle, separately, 171 head in all; all branded with the ranch brand.

Witness did not see the cattle taken, and gave testimony as to their value.

The foregoing is the substance of the testimony for the plaintiff.

The defendant produced Lindsey Carson, who was sworn on his part, and testified as follows:—

I purchased of my brother, by a written article, 2d September, 1850; was living on the ranch at the time, and a year after I purchased.  I took charge of the ranch and stock immediately after I purchased; there were supposed to be 6000 head of cattle or over.  I sold between the 2d September and 15th May, some cattle to Chiles, say 295 in January, 1851.  The 3d August, 1851, I quit, surrendered up, and made a final settlement; surrendered to Mrs. Fitch and Henry; they gave me their obligation for 500 head of beef cattle and 100 head of stock cattle. They admitted them to be a balance in full due me, on account of Moses B. Carson's contract.  Plaintiff and Henry sold some cattle.  I forbid them selling or killing any, only for the use of the ranch, till I was settled with.  On the 12th October, 1850, she was going to the lower country, and Henry would transact her business during her absence.  Henry appeared to be head man, and not William, while the plaintiff was gone.  I lived on the ranch in the summer of 1850 to 3d September; to this time my brother Moses had charge of the ranch.  He marked and branded a portion of the cattle in the spring.  He had vacquerios on the ranch during that time and paid them.  I sold cattle in

the fall and winter of 1850 to the neighbors by the single head; these were counted in the settlement. I accounted for 400 head, including those my brother had sold—(witness stated the value of cattle at the time.) My brother told me he worked eight or nine yokes of cattle. I built the adobe house. I lived on the 200 acres after I purchased the interest of my brother. In 1850 had a conversation with plaintiff about delivering the ranch; she told me to count the cattle and turn them over. I asked her to furnish the horses. She offered those on the ranch, twenty-five or thirty. We had at least fifty conversations about the matter till we settled. I refused to turn over the cattle till she settled.

On cross-examination witness said, he went first on the ranch in May, 1849, and lived with his brother; built a mill; went back to the ranch in July, 1850; lived in a camp; went on by consent of his brother, and before he had any claim to the property; was living on the 200 acres when the cattle were taken. Moses said he was to have 200 acres when he settled, and if I would go and settle them he would give them to me. I don't think Mrs. Fitch moved in August, 1850, not till 1851; don't think she lived there between July and September, 1850. Moses had vacquerios after Mrs. Fitch came there in July. I have seen his Indians rodio the cattle but not corral them after Mrs. F. came. He did not mark any after she came. I saw him superintending the parting of cattle for Combs. The Indians were under his charge in doing it. Mrs. Fitch was at the house; the boys may have been present. The major domo is the overseer of the ranch, and acts under the direction of the proprietor. The cattle were bought of Mrs. F. Coomb wanted cattle of Moses on the contract. Moses refused, because plaintiff had ordered him not to deliver the cattle. The only acts of possession I know of my brother Moses exercising, were, that he would come to my house and bring cattle there, and have them killed for the use of the house; he had cattle killed for the Indians at work between July and September, 1850. I don't know if Mrs. F. knew of the killing. Cattle used off the ranch by Moses were accounted for in the settlement. I never marked, branded, corralled, or rodiod any of the cattle. I sold 295 head without her knowledge; she told me the cattle I was selling and using to keep an account of. The cattle I sold (295

head), were not rodiod by men in my employ. I went to see Henry about a rodio in July, 1851. I thought he was fool enough to do it, and pay for the brands. I don't know but I did tell some of the family not to deliver the cattle to the defendant.

A letter from plaintiff to Lindsey Carson was given in evidence, dated April 22, 1851, Asking to "let me know when you shall be ready to deliver to me, in the name of your brother, my ranch and all appurtenances belonging to it.

(Signed)  " JOSEFA FITCH."

And the answer of Carson, dated April 25, 1851. Extract: "The only answer I can make, is that you have some eight months ago taken possession of the same. The last conversation I had with you, you was to have been here in this month, and deliver to me my part of the stock, and all that I want is a compliance with the same, and now, that the time is about out, you will try and make some exertions to comply. I told your son, Henry, since you have been in Sonoma, that I wished the business settled at the time appointed.

(Signed)  " LINDSEY CARSON."

The witness, on cross-examination, further stated: I was not present when the cattle were sold on execution.

Question by plaintiff. Did Mrs. Fitch put any horses on the ranch for the use of the vacquerios in the fall and winter of 1850 and 51 ? Objected to by defendant. Sustained, and excepted to by plaintiff.

In my account with Mrs. F. on settlement, the cattle taken by Brockmon were not mentioned. There was nothing said about these cattle in our settlement.

Question by plaintiff. Did you state to Henry and Frederick Fitch, that if their mother allowed the cattle to go, you would not allow them in the settlement ? Objected to by defendant. Objection sustained, and excepted to by plaintiff.

We did not count the stock on 23d August, on final settlement. We made a jumping settlement. I took their obligation for 600 cattle as my share.

It was also agreed by counsel to admit that Pierpoint, if present, would swear, that plaintiff admitted and said that the cattle in the said complaint mentioned, were not, at the time of

the alleged taking, in her possession, but that they were in the possession of one Carson, and had been for a long period of time.

The defendant offered the contract between Lindsey and Moses Carson, which plaintiff objected to. Objection overruled, and exception by plaintiff.

By this contract, Moses B. Carson bargained and sold unto Lindsey Carson "4500 head of cattle, embracing my entire interest in the undivided cattle, more or less, of the Fitch estate, also, 50 head of horses, mares, and colts, more or less, 200 head of sheep, more or less; in fact, the intention is to sell and convey all my right, title, and interest in the undivided stock of the Fitch estate, for and in consideration of the sum of $20,525. I acknowledge the receipt of $1000, and the balance in the following bequests, to wit, $2000 on 1st September, 1851, and so on" (notes for the balance unpaid). Signed, M. B. Carson, dated 2d September, 1850, and acknowledged the same day before Martin Cooke, Notary Public, and recorded September 3d.

Question by defendant. When did Moses Carson assign the contract to you? Objection by plaintiff overruled. Exception by defendant.

Ans. On the 2d September, 1850.

Question by defendant. What estate is this referred to in the contract? Objection by plaintiff overruled, and plaintiff excepted.

Ans. The estate of H. D. Fitch, deceased.

Question. Where was the stock running at the time you bought of Moses Carson? Objection by plaintiff overruled, and plaintiff excepted.

Ans. It was running on Sotoyome Ranch.

Witness proceeds. I don't know that Moses Carson had any other property in the estate taken than what he acquired under the contract of him and Henry D. Fitch. There were no cattle on the ranch that had my private brand on.

The plaintiff also proved by Mr. Billings that he was at the ranch the 11th, 12th, or 13th of May. Mrs. F. wanted advice about the Carson difficulty. Mrs. Fitch made a rodio by her major domo. Did not see the rodio, but heard a noise as of a rodio,

saw the rodio ground, and the marks of cattle, &c.  8 or 10 vacquerios were in with the cattle, who were all that day branding and cutting them; they were in the employ of Mrs. Fitch. Carson was there one-half or three-quarters of an hour; he talked about settling, but had nothing to do with the cattle.  All the Fitch boys were there, and the whole family.  No one apparently had charge of the business, except Mrs. Fitch.  I left on the 12th May.  As I came back, I met defendant and Pierpoint going after cattle; there had been a sale previous to this. I think the cattle were taken on the 14th or 15th.  I heard the next day they had been taken.  I saw them go through the city of Sonoma.

Plaintiff produced in evidence the following receipt:—

" Received, May 13, 1851, from the possession of Mrs. Henry Fitch, upon her ranch at Russian River, two hundred head of stock cattle, which I have levied upon and seized as the property of Lindsey Carson (as the bailee or lessee of Moses B. Carson), upon an execution of John A. Griffith *v.* Lindsey Carson.

(Signed)   " ISRAEL BROCKMON,<br>" Sheriff of Sonoma County."

The plaintiff asked the court to instruct the jury as follows:—

1st. That if the jury find that the defendant took the property from the possession of the plaintiff, he is liable to the plaintiff in this action, unless the jury find that defendant was owner of the property, or took by virtue of a legal process against the true owner, or had plaintiff's permission or license to take the same.

2d. That evidence of the plaintiff having corralled, branded, rodiod, worked, and milked the cattle by herself or her agents, is evidence of possession in her, and that it is not necessary for the plaintiff to prove that she was personally and constantly in view of the property, to establish a possession in herself.

3d. That the evidence of Lindsey Carson, if believed, proves the possession of the property to have been in the plaintiff at the time of the trespass.

4th. That evidence that Henry Fitch was agent of the plaintiff, in taking charge of the ranch and transacting business generally, would not be sufficient to prove an agency authorizing him to

consent to the levy and sale, or taking by the defendant of the cattle, so as to bind the plaintiff, and prevent her recovering in this action.

5th. That if the jury find that the cattle were not present and within view of those attending the sale, then the sale was void, unless the jury find that the cattle had the mark or brand of the execution debtor, Lindsey Carson.

6th. That unless the defendant sold the particular cattle taken by him, he was not justified in taking them from the possession of the plaintiff.

7th. That if the jury find that Lindsey Carson owned but an undivided interest in the cattle, the sale of the whole was such an abuse of his authority as would make him liable in trespass to the plaintiff; provided the cattle were taken from the possession of the plaintiff.

8th. That the contract between Henry D. Fitch and Moses B. Carson did not give Moses B. Carson any legal title to any of the cattle till after the contract was performed by M. B. Carson, and the cattle delivered.

9th. That neither M. B. Carson nor his assignee under the contract with Henry D. Fitch had right to the possession of the cattle or ranch, after the 12th day of October, 1850 (as against the owners).

10th. That M. B. Carson, under the contract with H. D. Fitch, had no right to assign his interest in the contract or cattle to Lindsey Carson, and put Lindsey Carson in possession.

11th. That Lindsey Carson, after the 2d day of October, 1850, had no legal right, under the contract between H. D. Fitch and M. B. Carson, and the assignment or contract between M. B. Carson to himself, to either the possession of the ranch or cattle.

12th. That Lindsey Carson, by virtue of the contract between H. D. Fitch and M. B. Carson, and the contract between Moses B. Carson and himself, had no interest in the property that could be seized and sold on execution.

13th. That the evidence of Lindsey Carson does not prove a possession in him.

14th. That there is no evidence showing a possession of the property in Lindsey Carson.

The District Judge instructed the jury that the 1st, 2d, 4th, 5th, 6th, 7th, and 9th of the foregoing instructions were correct and given.  That the remaining ones, the 3d, 8th, 10th, 11th, 12th, 13th, and 14th, are refused, and not given.

For refusing the last-designated instructions, the plaintiff excepted.  Verdict for defendant.  Plaintiff appealed.

[The Reporter begs to remark, by way of apology for the length of the foregoing detail of the evidence in this case, that in the generality of the concluding part of the opinion of this court, the whole evidence appears to be embraced, and he did not venture materially to abridge it.]

*Hallack, Peachy, Billings,* and *Park,* for appellant.

The questions of plaintiff's counsel excluded by the court were evidence.  If plaintiff improved the ranch, on which the cattle ran, branded the old and young ones the same spring they were taken, and paid the taxes, they were facts from which possession might be inferred.  Cal. Rep. 264, 5, and 6.

The questions asked on the cross-examination of Lindsey Carson, that were designed to show that his possession was limited to the 200 acres, were improperly rejected.

The defendant was a mere stranger, and had no right to take the cattle; and the questions concerning the witness Henry acting as executor, &c., were improper.

No evidence was offered to prove that Henry was the agent of his mother, with power to consent to a sale, &c.  It was, therefore, error to permit the question, " Did you at the sale say you would deliver the cattle to the buyer ?" The effect of this is seen in the verdict.

So the offer of plaintiff to prove that the whole cattle and not a part were sold, it was error to reject.  If the sale had been otherwise valid, the sale of the whole, when Carson claimed but a part, would have invalidated it.  2 Hill Ch. 47, 15 Mass. 82.

It was error to refuse the said instruction.  The contract will not admit of any other construction.  See Hurd *v.* Darling, 16 Tr. Rep. 381.

By the contract M. B. Carson became the major domo, or

overseer of Fitch, for a term of years, and was to receive his compensation in cattle, and a portion of the crops. He was on the ranch, not in his own right, but as the servant of Fitch. He was to take the ranch under his charge, and take care of it, &c., for its better improvement, &c., and in recompense of his services, Fitch was to give him one-fourth of the increase of the cattle, &c.

Fitch was bound to perform at the proper time, or would have been liable in damages. But Carson was no tenant in common, in any part of the property, and could only acquire a title to such portion as should be set apart for him.

The contract was personal with Carson, had relation to his skill, judgment, &c., in the premises, and could not be assigned.

So the 12th and 13th instructions it was error to refuse.

The verdict was against law. The defendant was a mere trespasser, and his proceedings were void, even as against Lindsey Carson. The cattle were not in view at the sale, and were without the mark of the execution debtor. See Cal. Statutes, 1850, p. 445.

Lindsey Carson, it is not urged, had more than one-fourth of the *increase*, yet the whole were sold, including the old stock, in which he never had any interest.

So defendant did not sell the cattle taken, but so *many* in number, including old work oxen and milch cows.

All the evidence shows possession in the plaintiff.

There is no brief filed for respondent.

HEYDENFELDT, Justice, delivered the opinion of the court. MURRAY, Chief Justice, concurred.

There are many very palpable errors pointed out in the record. The various questions asked by the plaintiff, which might have produced answers showing acts of ownership on the part of the plaintiff, and thereby tending to prove her possession of the property, were all proper, and should not have been excluded.

The 8th, 10th, 11th, and 12th instructions, which were asked by the plaintiff and refused, ought to have been given.

The true construction of the contract between Fitch and Carson gives to the latter no present interest in the live stock, but

only the right to acquire a determinate interest, after the performance of all the stipulations on his part, and these could not be completed until the expiration of five years from the execution of the contract.

Furthermore, the undertaking on the part of Carson was strictly personal, the result of the confidence which Fitch had in his integrity, skill, and capacity. It entered into the spirit and meaning of the contract, that he, Carson, should do the duty required, and that no other should be substituted for him.

It is, however, too clear for further argument, upon a proper view of the whole case as presented by the record, that Lindsey Carson, the assignee of Moses Carson, had no right whatever in the cattle which could be made the subject of levy and sale.

The court therefore erred in refusing the instructions mentioned, for which, and the error of improperly excluding the evidence referred to,

The judgment is reversed, and the cause remanded.