BANCROFT v. SCRIBNER et al.[1]

(Circuit Court of Appeals, Ninth Circuit. February 24, 1896.)

No. 212.

1. CONTRACTS OF AGENCY—ASSIGNABILITY.
    A contract by which a bookseller was constituted the sole and exclusive agent of a publisher, to sell, by subscription only, a certain book, and to collect payment therefor, required the agent to use his best efforts to procure as many subscriptions as possible, to exercise a minute personal supervision over all canvassers, to remit within 30 days after shipment a sum equal to the subscription price, and to remit for 10,000 copies

---

[1] Rehearing pending.

within one year after the complete publication of the work. The contracts of subscription were to be directly with the publishers, the agent to have compensation by commissions only, and the publishers required the agent to give them a personal letter stating that he could fulfill all his engagements. *Held,* that this contract was purely one of agency, resting upon confidence in the personal skill, energy, and resources of the agent, and that it was therefore not assignable without the consent of the publishers.

**2. SAME—RATIFICATION OF ASSIGNMENT—TRIAL—INSTRUCTIONS.**

Where it was claimed that a principal, after refusing to recognize an assignment of a contract of agency, had ratified the assignment by failing to answer certain letters addressed to him by the assignee, and by receiving and retaining for a time certain moneys remitted by him, *held,* that it was sufficient for the court, after explaining these transactions, to charge the jury that, notwithstanding the express refusal to recognize the assignment, they might consider these acts and omissions as a ratification, if they believed them to be such, under all the circumstances.

**3. SAME—LIQUIDATED DAMAGES.**

A contract of agency for the sale of a book by subscription provided that in case of the agent's failure "to take subscriptions, make requisitions, or remit for the total number of copies herein guarantied within one year," the agent should pay, as liquidated damages, the contract price, less commissions and the cost of producing the books. In an action for breach of the contract the publishers, not relying solely on the agreed liquidation, gave evidence of their actual damages; proving that by the failure to carry out the contract the books were left on their hands, and became unsalable, because of the decline of public interest in the subject-matter. *Held* that, independently of the question whether the above provision was for liquidated damages, or a penalty, the court would have been justified in instructing the jury that the verdict, if for plaintiff, should be for the full extent of the damages proven.

In Error to the Circuit Court of the United States for the Northern District of California.

Geo. C. Sargent and Fox, Kellogg & Gray, for plaintiff in error.

Chickering, Thomas & Gregory, for defendants in error.

Before GILBERT, Circuit Judge, and KNOWLES and BELLINGER, District Judges.

GILBERT, Circuit Judge. Charles Scribner's Sons, of New York, brought an action against A. L. Bancroft, of San Francisco, to recover moneys claimed to be due, and liquidated damages for the breach of two certain contracts for the sale by subscription of certain books which they had published. The trial resulted in a judgment for the plaintiffs for the recovery of the liquidated damages, in the sum of $7,734.49.

There are three principal assignments of error. The first is that the court instructed the jury that the contracts were not assignable by Bancroft. From the bill of exceptions, it appears that on January 31, 1890, Bancroft, under his firm name of A. L. Bancroft & Co., wrote to Scribners, soliciting the agency of Stanley's book, "In Darkest Africa," which was about to be published. The letter sets forth in detail the qualifications of the writer's firm; alludes to the fact that that firm are not publishers, and that their whole time and attention are given to the sale of subscription books. It explains their facilities for securing the largest possible sale, and states that they are young, full of energy, and possess ample capital, and a

determination to lead all others in the sale of subscription books. It closes with these words, "If you seek a guaranty from your general agent, you can reckon us in at the top figure." In a subsequent letter Bancroft refers Scribners to Messrs. Webster for information concerning his responsibility. This reference was found satisfactory. Scribners required that the contract be made by Bancroft individually, and not in his firm name, and that he furnish them a personal letter stating whether or not he could fulfill all his engagements, and whether they could rely upon him, and whether his wife would sign the guaranty clause as surety. When the contract was finally executed, Scribners wrote Bancroft that they had signed it upon the strength of his assurances. Later in the same year a similar contract was entered into concerning the sale of another book published by Scribners. The features of the first contract that are pertinent to the question under consideration are that, by its terms, Bancroft is made the sole and exclusive agent, to solicit subscriptions, deliver books, and collect payments; that he agrees to use his best efforts to procure as many subscriptions as possible, to advertise the book thoroughly and sell by subscription only, to confine his operations exclusively to his own territory, to remit within 30 days after shipment of books a sum equal to the subscription price of all books consigned to him, to exercise a minute supervision over all canvassers, and to remit for 10,000 copies within 1 year after the complete publication of the work. The contract contains numerous specifications of the method in which Bancroft shall deal with and supervise all subagents and canvassers, and it provides for the execution of contracts of subscription directly between the subscribers and the publishers. Bancroft subsequently assigned his interest in both contracts to one Stuart. The terms of the assignment are not stated. The inference from the language used in the correspondence is that it was an absolute transfer, whereby Stuart took the place of Bancroft, and the latter severed his connection with the agency. Bancroft announced to Scribners that he had made a sale of his entire subscription book business. Scribners refused to recognize the transfer, or to accept Stuart in lieu of Bancroft.

From a consideration of all the correspondence, and the circumstances connected therewith, it is apparent that the contract was purely one of agency, and that it rested upon personal considerations. The agent was selected with great care. Both parties to the contract evidently believed that the success of the publication, and the extent of its sale, depended upon the experience, skill, and energy, as well as the resources and the facilities, of the general agent; that upon his integrity and responsibility depended the pecuniary profit of the investment. It was not in any sense a contract for the sale of goods. Bancroft was not a purchaser of the books. The books remained the property of the publishers until they passed into the possession of the subscribers. At no time did a title in them vest in the agent. His interest was a commission upon the subscription money,—upon the purchase price received from the subscribers. Bancroft had proceeded under the contract until June 1, 1891. At that time he was indebted to Scribners in more than

$2,000, and he was behind in his contract to the extent of 3,000 orders. In May, Stuart had written that he was negotiating with Bancroft for the purchase of his entire subscription book department. Scribners at that time were pressing Bancroft for payment. On May 11, 1891, Stuart telegraphed them, "Before completing purchase, wish to ascertain whether you will grant extension Stanley delivery four or six months," to which he received this answer: "Our contract is with Bancroft. Might extend it six months." Two days later, Scribners wrote Bancroft, "We now beg to add that we do not know Stuart, and that we naturally look to you to complete your contract, and are anxiously awaiting your remittance and explanation." The contract with Bancroft provided for a 30-days credit to him in making his remittances. Stuart assumed that this feature of the contract was also assignable to him. He even requested that the credit time be extended to 60 days. Subsequently, indeed, and after the expiration of both the contracts, he wrote to Scribners, offering to send the money in advance, and before the shipment of the goods, if he might have satisfactory assurances that they would fill his orders promptly. But he never did, in fact, send money for any such payment in advance. In the case of a contract such as is here disclosed, it is a presumption of the law that the trust is exclusively personal, and that it cannot be transferred or delegated by the agent without his principal's consent. Machine Co. v. Rosensteel, 24 Fed. 583; Warner v. Martin, 11 How. 209; McCormick v. Bush, 38 Tex. 315; Burger v. Rice, 3 Ind. 125; Flanders v. Lamphear, 9 N. H. 201; Titus v. Railroad Co., 46 N. J. Law, 393.

It is urged that conceding the contract of credit to have been one of confidence and trust, and therefore not assignable, so as to release Bancroft from his obligation, nevertheless he might transfer his interest to another, and thereafter sustain the relation of surety for that other. To this it may be said that the only information afforded in the bill of exceptions concerning the nature of the transfer is that it was an absolute one. There was nothing to indicate that Bancroft remained surety for Stuart, and, if he were such surety, it is impossible to see how that fact would alter the relations between Scribners and their general agent. Scribners, throughout the correspondence, refused to recognize Stuart, and they undoubtedly had the right to hold their agent to a compliance with his contract, or, in default thereof, to disregard the transfer to any other.

Error is assigned to the refusal of the court to charge, in substance, that the delegation by an agent of the authority conferred upon him may in any case be ratified by the principal, and that such ratification may be shown by words or acts, or by acts in spite of words to the contrary, or by proof of the acceptance of the benefits of the transaction concerning which the authority was delegated, and that the ratification of a part of an indivisible contract is the ratification of the whole. The only facts in the case which tended to prove ratification by Scribners of the transfer to Stuart was the fact that Scribners failed to answer certain letters which Stuart wrote them, and the fact that on October 1, 1891, they received from him a remittance of $2,413.75, which they passed to Bancroft's credit.

Their explanation of this latter transaction, as given at the trial, was that they supposed the money to have come from Bancroft in response to demands made upon him by their attorneys in San Francisco. Soon after this money was received, however, Stuart protested against the same being placed to the credit of Bancroft's account, and he threatened Scribners with a suit for its recovery. Scribners thereupon refunded the money to Stuart. The court charged the jury fully concerning both these subjects, and submitted to it the question whether there was ratification by Scribners of the transfer and assignment to Stuart. There was no occasion to add to the charge that was given upon this branch of the case. It is complained that the instruction, as given, fell short of saying to the jury that the acts of Scribners in ratification of the transfer were more to be regarded than their words in repudiation of the same. But the charge clearly implied this. The jury had before them the evidence of the words whereby the publishers made their objection to the assignment. The court, in effect, informed them that, notwithstanding these words, they might consider the failure of Scribners to answer Stuart's letters, and they might consider the acceptance and retention of the money so sent by Stuart acts of ratification of the assignment, if they believed them to be such, under all the circumstances.

The third assignment is that the court erred in instructing the jury in regard to the contract for damages. The contracts provided that "in case of his failure to take subscriptions, make requisitions, or remit for the total number of copies herein guarantied within one year" Bancroft should pay, as liquidated damages, the contract price, less the cost to Scribners of the production, and the amount of his commissions. In other words, the parties liquidated the damages to be paid by Bancroft in case of breach of his contract, and fixed as the measure thereof the amount of the profits which would thereby be lost to the publishers. It will not be necessary in this case to enter into a consideration of the question whether this clause of the contract provides for liquidated damages, or for a penalty. The defendants in error did not rely solely upon the agreed liquidation of their damages, but upon the trial they introduced evidence of the actual damages they had sustained. They proved that, by the failure of the plaintiff in error to carry out his contract, they were left with the books upon their hands, and that the books were by that time unsalable, owing to the decline of the public interest in the Stanley expedition, and that they could not be sold at the cost of their manufacture. The plaintiff in error made no effort to rebut or contradict this evidence, and introduced no proof whatever upon the subject. Under this state of the evidence, the court would have been justified in instructing the jury that, in case they found a verdict for the plaintiffs in the action, the amount thereof should be the full extent of the damages so proven. The judgment will be affirmed, with costs to the defendants in error.