## In re WATERSON, BERLIN & SNYDER CO.

District Court, S. D. New York. November 11, 1929.

Nathan Burkan, of New York City, for the motion.

Wise, Whitney & Parker, of New York City (F. C. Welles, of New York City, of counsel), opposed.

WOOLSEY, District Judge. The petition to have the copyright of the songs therein enumerated reassigned to the petitioners, as the composers thereof, is granted.

Reflection on the very interesting question involved in this case and a careful reading of the authorities cited by the counsel for the respective parties have only served to ripen into a settled conviction, the impression which

I took away from the argument, that those who have transferred original compositions, whether of literary or musical nature, to a publisher on the agreement that they are to be entitled to royalties during the life of the copyright—which the publisher is permitted by the agreement to take out—should not be made the victims of the publisher's financial casualties.

That is the clear equity of the situation, and such being the fact, it remains only to be determined whether the terms of the contract in this case, or any controlling authorities, prevent me from giving the composers of the songs herein involved the relief which they seek.

Among the relevant provisions of the royalty contracts in this case are the following:

"For the Consideration of the sum of One dollar, in hand paid to ———, party of the first part, by Waterson, Berlin & Snyder Co., party of the second part, the receipt whereof is hereby acknowledged, the said party of the first part does hereby sell, set over and transfer unto the said party of the second part, its successors and assigns a certain song or musical composition, including the words and music thereof, bearing the title ——— or any other title, name or style the said party of the second part may at any time give to the said composition, together with the right to take out a copyright for or upon the same, and each and every part thereof, including the words and music, to the full extent in all respects as the party of the first part could or might be able to do if these presents had not been executed.

"And the said party of the second part hereby covenant and agree to pay to the party of the first part 2¢ cents jointly upon each and every ordinary printed pianoforte copy sold and paid for of the said song or musical composition hereafter sold to the party of the second part in the United States, except as hereinafter mentioned or specified, such payment to be made only upon a full and complete compliance with all and singular the terms and conditions herein contained on the part of the party of the first part. And it is hereby expressly agreed that out of the first royalties to which the party of the first part may be entitled by or under the terms of this agreement the sum of ——— dollars, paid as advance Royalty, shall be deducted."

The third paragraph is not of importance here, because it contains merely an agreement by the composer that royalty shall not be payable to him for professional copies of the song, and certain other copies of various enumerated kinds.

The fourth paragraph contains a covenant of title and a representation that the author is the real author and owner of the composition with right to make the assignment to the publisher.

The fifth paragraph reads as follows: "Settlement on this agreement shall be made semiannually within thirty (30) days after the first days of January and July, respectively, during the whole term in existence of the copyright of said song and musical composition, according to such correct and proper statements of account as may be available on such days. Any such payment when made and accepted shall operate as a release to the said party of the second part, his successors or assigns, from any further claim or liability for any royalty up to the date thereof."

Under such a contract, I think, the royalty contract and the copyright are indissolubly bound together. They constitute the bundle of rights and obligations which the bankrupt's estate has under these contracts.

■ The right of every man to choose the person with whom he wishes to make a contract is well settled. It was admirably expressed in the case of Arkansas Valley Smelting Co. v. Belden Min. Co., 127 U. S. 379, 8 S. Ct. 1308, 1309, 32 L. Ed. 246, in which case it was said at page 387: "But every one has a right to select and determine with whom he will contract, and cannot have another person thrust upon him without his consent. In the familiar phrase of Lord Denman, 'You have the right to the benefit you anticipate from the character, credit, and substance of the party with whom you contract.' Humble v. Hunter, 12 Q. B. 310, 317; Winchester v. Howard, 97 Mass. 303, 305, [93 Am. Dec. 93]; [Boston] Ice Co. v. Potter, 123 Mass. 28 [25 Am. Rep. 9]; King v. Batterson, 13 R. I. 117, 120 [43 Am. Rep. 13]; Lansden v. McCarthy, 45 Mo. 106. The rule upon this subject, as applicable to the case at bar, is well expressed in a recent English treatise: 'Rights arising out of contract cannot be transferred if they are coupled with liabilities, or if they involve a relation of personal confidence such that the party whose agreement conferred those rights must have intended them to be exercised only by him in whom he actually confided.'"

■ A contract between a composer or an author and the publisher whom he selects is essentially a personal contract, for the basis on which the composer or author intrusts the publisher with his composition or his book is that he believes in the skill, the judgment, the integrity, and the reputation of the publisher as well as in his credit.

A personal contract of this kind is not assignable by either party without the other's consent.

Some most interesting remarks illustrating the reason for this rule were made by Lord Abinger in the case of Gibson v. Carruthers, 8 M. & W. 321, in which he was contrasting contracts which were assignable, from those which were not assignable, having before him in that case the question of a sale of goods in respect of which a trustee in bankruptcy was making claim. Lord Abinger said, at page 343:

"But there is a certain class of contracts, in which it is manifest that bankruptcy must put an end to all claim of the bankrupt or his assignees to the performance of them by the solvent party. The contract of partnership is a familiar instance; and in every case where the motive or consideration of the solvent party was founded, wholly or in part, upon his confidence in the skill or personal ability of the bankrupt, if the bankrupt, from his circumstances, is unable to perform his part, the assignees, as it appears to me, are not entitled to substitute either their own capacity, or skill, or credit, for that of the bankrupt. Suppose, for example, that a man of wealth, by way of encouraging bankers whom he wishes to patronize, should agree with them for a certain term of years to keep his cash with them, upon the faith of which agreement they take a shop, purchase strong boxes and incur other expenses necessary to carry on the trade. Upon their bankruptcy, their assignees would surely have no right to insist upon keeping his cash for the remainder of the term, or upon their right to find him a banker. An instance of another kind, but depending on the same principle, occurred between the late Sir Walter Scott and his booksellers, who had become bankrupts.

"He had engaged to write a novel, which they were to have the benefit of publishing, in consideration of which they were to pay him £4000, for which they had given him their acceptances in anticipation. Before the work was finished they became bankrupt, whereupon Sir Walter Scott took up all the bills he had negotiated. Upon the conclusion of his work, when it was ready for the press, the assignees contended, that by virtue of the contract they had a right to the profit of publishing it, which they were ready to undertake. Sir Walter Scott suggested several grounds to show that the credit, the skill, the judgment, integrity, and personal character and reputation of a publisher were matters of great importance to an author, on which the success and reputation of his works

might greatly depend, and therefore, insisted that, the consideration for his contract having respect to the personal credit and qualities of the bookseller, he was by their bankruptcy discharged from his contract. I must own that his reasoning appeared satisfactory to me; but a more obvious illustration of the principle on which it rested would have been afforded by reversing the case, and supposing that Sir Walter Scott had been the bankrupt and his book-sellers solvent, would they have been content to pay their £4000, and' take the risk of publishing a novel written by the assignees of the novelist?"

The same view is expressed in the case of In re D. H. McBride & Co. (D. C.) 132 F. 285, which came before this court in 1904 on a petition to review the report of Stanley W. Dexter, Esq., one of the referees in bankruptcy, whose report was adopted in toto by Judge Adams. Referee Dexter said, at page 288:

"That rights arising out of contracts involving a relation of personal confidence cannot be transferred in invitum is an elementary rule. Arkansas Smelting Co. v. Belden, 127 U. S. 379, 8 S. Ct. 1308, 32 L. Ed. 246; Bancroft v. Scribner, 72 F. 988, 21 C. C. A. 352. But it is urged that this principle applies only to assignment by act of a party, and not to assignment by operation of law, and that in any event, there could be no relation of personal confidence existing between the parties where the party to whom the confidence is extended is a corporation.

"Neither of these contentions can be sustained. Assignments by operation of law are sustained upon the principle that, unless expressly accepted, they must be deemed to have been in contemplation of the parties. A lease, for instance, passes to the trustee in bankruptcy (if he so elects), even if containing an express covenant against assignment. But a license under a patent right is held personal to the licensee, and does not pass to a receiver or administrator by operation of law. Oliver v. Rumford Chemical Works, 109 U. S. 76, 3 S. Ct. 61, 27 L. Ed. 862; Waterman v. Shipman, 55 F. 982, 5 C. C. A. 371.

"The distinction, therefore, lies in the nature of the contract, and where that involves personal trust and confidence it is not assignable even by operation of law. As to whether trust and confidence can be reposed in a corporation, I cannot, in these days of corporate management, find any real distinction, such as is suggested, between an agreement entered into between an author and an individual publisher, and a similar agreement with a publishing corporation. The management of the corporation may be such as to command especial confidence. The corporation may have a reputation in the trade of producing attractive publications and enjoy a valuable clientage.

"The precise question was considered in England by Sterling, J., in the recent case of Griffith v. Tower Pub. Co., 1 Chancery, 21, where, after reviewing the authorities, the learned justice held it clear that an agreement between author and publisher was of a personal nature, and that the benefit of it was not assignable by a receiver in bankruptcy. An injunction was granted against the receiver, who was threatening to sell all of his rights under the agreement between the author and the bankrupt publisher, to another publishing house. The same suggestion was made in that case as in this, viz., that the receiver was only selling the right, title and interest of the bankrupt, and that only the purchaser was affected by the claim of non-assignability. But the learned justice disposed of the suggestion in the following words:

" 'It is true that any assignment of the agreement might be inoperative; but still, it might give rise to disputes between the plaintiff and persons who might seek to avail themselves of the position of assignees.'

"That such disputes do arise is evident from the decision in the leading English case of Stevens v. Benning, 1 Kay & John. 168, affirmed 6 DeG. M. & G. 223, where the purchasers of the copyrights at an assignment sale sought to restrain the author from publishing the same work through another publisher. This case, together with Hole v. Bradbury, 12 Chan. Div. 886, and Reade v. Bentley, 4 Kay & John, 656, are additional authorities for the conclusions I have reached in this matter."

Judge Holt's opinion in the case of In re Howley-Dresser Co. (D. C.) 132 F. 1002, decided in the same year as the McBride Case and claimed by counsel for the receiver to be decisive of this motion in their favor, does not show what the terms of the agreement before him were. I have made an effort to see the original papers in that case in order to discover the nature of the agreement, but they cannot be found by the clerk of this court, and I do not think I should take as a precedent a decision which does not clearly show that the circumstances were the same as in this case, when the decision seems to be contrary in principle to another decision of this court and is contrary to my own views.

Surely Judge Holt's opinion could not mean that the rights of a trustee in bank-

ruptcy are broader than those of the bankrupt or that existing equities are cut off by the bankruptcy of the fiduciary.

I am quite aware that there is a case in England, In re Grant Richards: Ex parte Warwick Deeping, [1907] 2 K. B. 33, in which Mr. Justice Bigham took a view inconsistent with mine on a royalty contract between publishers who had become bankrupt and Mr. Warwick Deeping, the well known author, and that Justice Bigham in that case, without reserving judgment and without citing any authorities, stated that he regarded the situation as analogous to a sale of goods on terms that they were to be paid for according to different scales in different events, and that consequently Mr. Deeping's claim must be limited to a claim for the damages he had sustained by reason of the breach of the agreement by the bankrupt to pay royalties.

With all the deference due to such a great judge as Justice Bigham, I must disagree with this decision and with his analogy.

Justice Bigham's decision was not appealed, and in order to correct the unjust results which it was considered followed from his decision, the English Bankruptcy Act of 1914 contained a section correcting the situation. That was section 60, which reads as follows: "Where the property of a bankrupt comprises the copyright in any work or any interest in such copyright, and he is liable to pay to the author of the work royalties or a share of the profits in respect thereof, the trustee shall not be entitled to sell, or authorize the sale of, any copies of the work, or to perform or authorize the performance of the work except on the terms of paying to the author such sums by way of royalty or share of the profits as would have been payable by the bankrupt, nor shall he, without the consent of the author or of the court, be entitled to assign the right or transfer the interest or to grant any interest in the right by license, except upon terms which will secure to the author payments by way of royalty or share of the profits at a rate not less than that which the bankrupt was liable to pay."

It is obvious that the composers involved in this case might have made any one of the several arrangements with their publishers.

They might have sold the songs, or, if they had been copyrighted, the copyrights thereof to the publisher for cash; or they might have retained the copyrights and licensed the publishers to publish under them; or they might have made a contract such as they did here with a provision—not here contained—permitting them the right to recapture the copyrights if the royalties were not paid owing to bankruptcy or for any other reason.

Under any of these arrangements the question here involved would not have arisen, for on the sale for cash the bankrupt would have had a right to do as it pleased with the copyrights; and under the other two arrangements suggested there would not have been any question as to the rights of the composers.

But what was done here involved a transfer, absolute on its face, in exchange for a covenant by the publisher for the payment of certain agreed royalties to be accounted for semiannually during the whole term of the copyright, i. e., 28 years.

This, if I may use an expression familiar in other connections, sounds in equity, and necessarily involves a fiduciary relationship.

If the publisher failed to account or failed to make a satisfactory account, equity would compel an accounting on the ground that he was a fiduciary. Or if the publisher announced his purpose to sell without the author's consent—whether free of the royalty contract or not—the copyright which he has been permitted to secure, can it be doubted that the composer would be afforded equitable relief? It must, I think, always be borne in mind that composers, authors, patentees, and owners of trade-marks are among the wards of chancery, for their intangible property rights depend for their value principally on the protection afforded to them by the equity courts.

The publisher here was therefore, in respect of the copyrights, in the position of a trustee who was bound to pay to his beneficiary a part of the fruits of their mutual arrangement.

When, as here, the publisher has, through his bankruptcy, become unable further to perform his trust, I think that the composer or author, as the case may be, is entitled to rescind the royalty contract on the ground of failure of consideration, and secure back the copyrights which have been issued to the publisher in pursuance of the royalty contract. De Bekker v. Stokes Co., 219 N. Y. 573, 114 N. E. 1064, reported below in 168 App. Div. 452, 153 N. Y. S. 1066, and 172 App. Div. 960, 157 N. Y. S. 576; Graves v. White, 87 N. Y. 463, 466; Raftery v. World Film Corp., 180 App. Div. 475, 167 N. Y. S. 1027; De Mille Co. v. Casey, 115 Misc. Rep. 646, 189 N. Y. S. 275; Cowper v. Theall, 40 Hun (N. Y.) 520, 522.

I conclude, therefore:

1. That such royalty contracts as those under consideration here involve such person-

al elements of trust and confidence that they are not assignable without the consent of the parties,

2. That such contracts may be rescinded by the composers when the publisher, as here, is unable or definitely refuses to fulfill his obligations thereunder, and

3. That the composers, therefore, are entitled to recapture the copyrights of their songs from the bankrupt estate.

Of course, on the rescission of such contracts the bankrupt must have returned to him any royalties paid in advance, and not yet earned, in order that the rescission may not fail to be equitable in regard to other creditors of the bankrupt.