[Civ. No. 22975.   Second Dist.   Div. One.   Jan. 30, 1959.]

EDGAR RICE BURROUGHS, INC. (a Corporation), Appellant, v. COMMODORE PRODUCTIONS AND ARTISTS INC. (a Corporation), Respondent.

464

Loeb & Loeb, John L. Cole and Alfred I. Rothman for Appellant.

Dryer, Hails, Burris & Lagerlof and H. Melvin Swift, Jr., for Respondent.

WHITE, P. J.—This is an appeal by plaintiff from an adverse judgment in an action for declaratory relief, and in

which defendant counterclaimed against plaintiff for the sum of $1,215.75.

On December 21, 1950, the parties hereto entered into a written contract wherein plaintiff granted to defendant the rights to use certain material featuring the character Tarzan "in live and/or transcribed radio broadcasts."

Included in the agreement was a provision that "In the event Commodore (defendant) shall for any continuous period of six (6) months during the term of this Agreement or any renewals thereof fail to broadcast a radio program released over three or more stations simultaneously then Burroughs (plaintiff) shall have the right to terminate this Agreement. . . ."

It was in reliance upon this provision that plaintiff attempted to terminate the foregoing agreement. Plaintiff also alleged that the contract had been breached because of defendant's dealing with an organization known as S. W. Caldwell, Ltd., with relation to defendant's Canadian sales of the radio broadcasts, and because defendant allegedly had not fully accounted to plaintiff and paid to the latter the percentage required by the contract. By its amended complaint plaintiff set forth the additional allegation that the aforesaid contract of December 21, 1950, "is void for want of a sufficient cause and is void for want of consideration."

By its answer defendant denied the material allegations of plaintiff's pleadings, pleaded res adjudicata, and also counterclaimed for certain monies it had allegedly failed to deduct through mistake and inadvertence, as deductible costs under the aforesaid contract, and which resulted in overpayments to plaintiff.

The cause proceeded to trial before the court resulting in a judgment denying plaintiff any relief upon its pleadings and that defendant recover on its counterclaim from plaintiff the sum of $1,215.75. From such judgment plaintiff prosecutes this appeal.

■ Appellant's main contention is that the agreement here in question contemplated network broadcasts of the Tarzan program. That since respondent did not have network broadcasts on the air appellant was entitled to terminate the agreement, and that the findings of the trial court to the contrary are unsupported by the evidence. With this contention we cannot agree. What the contract required was that "In the event Commodore (respondent) shall for any continuous

period of six (6) months during the term of this agreement . . . fail to broadcast a radio program released over three or more stations simultaneously then Burroughs (appellant) shall have the right to terminate this agreement. . . .''

It is true, as urged by appellant, that an expert witness produced by it testified that the phrase ''a radio program released over three or more stations simultaneously'' meant in the radio industry, ''the draftsman of this document (the contract) was describing a *network* broadcast, three or more stations connected together by way of a *network*.'' But there was also testimony that at no time during the negotiations leading up to the contract was reference made to a network, or to instantaneous broadcasts, and respondent's expert witness testified that with reference to transcriptions the word ''simultaneous'' meant the same broadcast within the week or within the month, and that the term ''simultaneous'' broadcasting over three or more stations'' means in effect that there were three or more stations under contract to broadcast at one time. There was also testimony that from approximately October, 1953 on, all radio stations broadcasting the Tarzan programs were located in Canada, and that the stations in Canada are not on a network. All of the Tarzan radio programs in Canada were transcribed on tapes. In its reply brief, appellant disavows respondent's claim that the former's position is that the language ''released over three or more stations simultaneously'' requires network broadcasts where there is an instantaneous release from three or more stations and asserts that its contention is that the contract requires network broadcasts. On the issue now under consideration, the court below was confronted with conflicting evidence. The trier of fact weighed this evidence and resolved the conflict in favor of respondent. Under well established rules we cannot reweigh the evidence favorable to respondent and if that evidence is sufficient as a matter of law, the conclusion arrived at by the trial court cannot be rejected by us (*Scott* v. *Nevis*, 120 Cal.App.2d 619, 621 [261 P.2d 797]; 4 Cal.Jur.2d 487, Appeal and Error, § 606).

█ It is next contended by appellant that since the agreement does not obligate respondent to do anything, it is lacking in mutuality of obligation and void for want of consideration. In this claim appellant cannot be sustained. █ It is well recognized that a written agreement should receive such an interpretation as will make it operative, reasonable

and capable of being carried into effect, if that can be done without contravening the intention of the parties, and interpretation which gives effect to a contract is preferred to one which makes it void (*Long Beach Drug Co.* v. *United Drug Co.*, 13 Cal.2d 158, 166 [88 P.2d 698, 89 P.2d 386]). We believe that taking the agreement now before us in its entirety, it was properly construed by the court as one in which appellant granted to respondent the exclusive right to use the Tarzan material with the provision that if respondent failed to broadcast over three or more stations simultaneously for any consecutive six-month period and did not give a written notice of election, not here pertinent, appellant could terminate the agreement. The evidence undisputably shows that upon execution of the contract, respondent proceeded to make and produce 75 Tarzan episodes at a cost to respondent of approximately $1,000.00 each (*Ross* v. *Frank W. Dunne Co.*, 119 Cal.App.2d 690, 697, 698 [260 P.2d 104]). What the contract in fact did was simply to give respondent the sole right to use the word ''Tarzan'' in stories to be broadcasted. We are not here confronted with any evidence to support appellant's theory that consideration was lacking for there was no such evidence. One of the disputable presumptions is that ''there was a good and sufficient consideration for a written contract'' (Code Civ. Proc., § 1963, subd. 39). And on appeal, supporting evidence may consist merely of a presumption (*Estate of Brimhall*, 62 Cal.App.2d 30, 34 [143 P.2d 981]; *Williams* v. *Reed*, 48 Cal.2d 57, 62 [307 P.2d 353]; *Thom* v. *Stewart*, 162 Cal. 413, 421 [122 P. 1069]). Under section 1614 of the Civil Code, ''A written instrument is presumptive evidence of a consideration,'' and, ''The burden of showing a want of consideration sufficient to support an instrument lies with the party seeking to invalidate or avoid it'' (Civ. Code, § 1615). Furthermore, even though we assume that the contract here in question was unilateral at its inception, there was part performance by the promisee and that furnishes a valid consideration and cures the lack of mutuality, if any, that existed originally. In *Los Angeles etc. Co.* v. *Wilshire*, 135 Cal. 654 [67 P. 1086], in which case the contract on the date of its execution was unilateral, the court, at page 658, stated: ''The promised consideration had then been partly performed, and the contract had taken on a bilateral character. . . .'' (See also *Wilck* v. *Herbert*, 78 Cal. App.2d 392, 407 [178 P.2d 25]). In the case at bar the broad-

casting of these "Tarzan" programs commenced in the United States on January 4, 1951, and about October, 1953, broadcasting in Canada was commenced. To us it seems inequitable and unjust after some five years during which respondent engaged in these broadcasting activities expending substantial sums of money, in which appellant acquiesced and received its share of the profits therefrom, to say that appellant may now urge the lack of either consideration or mutuality.

It is next urged by appellant that respondent breached the written contract of December 21, 1950, by delegating the duties of the latter to S. W. Caldwell, Ltd. This contention is based on the claim that the agreement herein involved duties of a personal nature which are nondelegable, and secondly, because, by reason of the claimed assignment to S. W. Caldwell, Ltd., respondent thereafter failed to remit to appellant the amounts to which it was entitled under the agreement. Appellant relies upon the rule announced in 2 Williston on Contracts, rev. ed., pp. 1172-1176; *Coykendall* v. *Jackson,* 17 Cal.App.2d 729 [62 P.2d 746]; *Sumner* v. *Nevin,* 4 Cal. App. 347 [87 P. 1105]; *Fitch* v. *Brockmon,* 3 Cal. 348; *Bancroft* v. *Scribner* (C.A.A. 9th), 72 F. 988 [21 C.C.A. 352]; and *La Rue* v. *Groezinger,* 84 Cal. 281 [24 P. 42, 18 Am.St.Rep. 179], that a contract is not assignable and the duties thereunder are not delegable in either of the following situations: (1) where in the nature or circumstances of the case the skill, credit or other personal quality of the party was a distinctive characteristic of the thing stipulated for, namely, the personal nature of the contract itself, or (2) the personal quality of the party was a material inducement to the other party entering into the contract. In the instant case, the agreement recited that appellant was the sole owner of the basic rights and/or copyrights to all published works featuring "Tarzan" as the principal character, that appellant granted to respondent the sole and exclusive right for certain areas of the world, including Canada, "to use 'The material' as well as the name 'TARZAN' in live and/or transcribed radio broadcasts." "The material" was defined as the "basic rights and/or copyrights of all published material (including comic books and newspaper comic strips) featuring 'TARZAN' as the principal character." As respondent points out, there is no restriction in the contract on the manner of use of the material granted other than that respondent agrees that the character "Tarzan" shall be the principal character in all broadcasts and

that he shall not be incorporated in a humorous or ridiculous fashion in such broadcasts nor shall he ever be maimed or killed.

Upon execution of the contract respondent proceeded to make and produce seventy-five (75) Tarzan episodes at a cost of approximately $1,000 per episode. Appellant did not supply any of the story material for any of the episodes, and did not supply any other services or facilities in connection with the production of the stories other than the right to use the word "Tarzan."

The undisputed evidence is that a production company of the United States cannot sell its programs in Canada without an agent residing there. Respondent had been doing business in Canada with National Programs, Ltd., which in 1951 sold its distributing rights to S. W. Caldwell, Ltd. Thereafter, S. W. Caldwell, Ltd. acted as respondent's sales distributor or agent in Canada for a number of programs, including the Tarzan series. There is also evidence that respondent told appellant about going into distribution in Canada, and about the Caldwell organization, and that appellant did not object to that method of distribution. There was testimony that all the radio programs broadcast in Canada were transcribed on tape. That the radio tapes were under respondent's control, were within its knowledge and that the program belonged to respondent at all times. Respondent had no written agreement with Caldwell, but had an oral working arrangement. Respondent gave S. W. Caldwell, Ltd. instructions regarding the type of sponsor the program was required to have and helped stimulate sales efforts. We are satisfied that the situation as reflected by the foregoing factual narrative does not bring this case within the purview of the aforesaid cases cited by appellant. We fail to perceive wherein respondent assigned or delegated the license it received from appellant, namely, the right to use "The material" and the name "Tarzan" in radio broadcasts. Looking to the negotiations leading up to the signing of the contract, it seems apparent that appellant was aware that respondent's profits came in part from the sale of the radio broadcasts, and the method by which these sales were made was not encumbered or restricted in any manner by the terms of the contract. The contract specifies Canada as one of the areas in which respondent could use the name "Tarzan" in radio broadcasts. The evidence reflects that a production company in the United States cannot sell

its programs in Canada except through an agent residing there. Furthermore, the programs at all times belonged to respondent who simply sold them in Canada through an agent. And we find an acquiescence by appellant in respondent's Canadian sales as evidenced by appellant's acceptance of its share of the profits in accordance with copies of statements rendered by the Caldwell organization, and which were sent to appellant.

As to appellant's claim that by reason of the so-called Caldwell arrangement it was deprived of benefits and profits which it would otherwise receive, it is contended that the agreement provides for respondent paying to appellant in full for all rights granted, 12½ per cent of the net profits, if any, realized by respondent, whether from the sale or otherwise, of the radio broadcasts, and specifies that net profits shall mean the amounts actually received by respondent less certain expenses of production. That sales or distribution expense is not a deductible item of expense. The uncontradicted testimony, says appellant, is that defendant and S. W. Caldwell, Ltd., split the receipts from Canadian radio stations on a 60-40 basis, with S. W. Caldwell, Ltd., remitting to respondent 60 per cent of such receipts and retaining 40 per cent of its share. Respondent paid to appellant 12½ per cent of said 60 per cent which it received rather than 12½ per cent of the total amount paid by the Canadian radio stations. That the result was that by reason of the sales activities being conducted by S. W. Caldwell, Ltd., rather than by respondent, appellant was deprived of a substantial share of profits to which it otherwise would have been entitled, to wit, 12½ per cent of the 40 per cent retained by S. W. Caldwell, Ltd.

However, the contract provides that "net profits shall mean *the amounts actually received by Commodore* (respondent)" (emphasis added) less certain items which could be deducted from the amounts actually received. The evidence shows that respondent did actually pay to appellant 12½ per cent of the net amount received by it; sent to appellant copies of statements rendered by S. W. Caldwell, Ltd., to respondent, and respondent also sent its own statements remitting to appellant 12½ per cent of the net amount respondent had received. At the trial appellant's counsel stated: ". . . There is no question but what we got reports right along on the stationery of Commodore Productions and Artists Company, and that they paid us 12½% of whatever that income was. We don't

dispute that.'' All of the foregoing statements and remittances were accepted and kept by appellant without objection. It is also revealed by the evidence that the ''Tarzan'' radio broadcasts made in South Africa were handled by an agent in Australia who used an accounting procedure similar to that utilized by the Caldwell organization; that appellant knew of this and made no objection. Such remittances from Australia on the South African broadcasts and which were introduced into evidence, show that respondent received a royalty only which was actually sent to appellant, which forwarded the money to respondent, which in turn paid appellant 12½ per cent of that amount. Viewed in the light of appellant's acquiescent conduct as to the Canadian broadcasts, its complaint in regard thereto lacks substance here.

Finally, appellant earnestly insists that respondent's counterclaim is barred by the statute of limitations (Code Civ. Proc., § 338, subd. 4). In this regard the record reflects that in an earlier action between the parties herein as plaintiff and defendant, plaintiff (appellant herein) in the latter part of 1955 made an audit of defendant's (respondent herein) books. That appellant's auditor later stated to respondent's president that the latter had failed to retrieve approximately $9,000 worth of costs incurred in the production of Tarzan programs (defendant in said prior action being entitled to deduct such costs before accounting to plaintiff therein), and that respondent remitted 12½ per cent of its receipts from a sponsor without deducting from these remittances the amount it was entitled to deduct, because of previously incurred costs, so that appellant received remittances calculated on a higher figure than should have been the case. Respondent did not discover this until the 1955 audit which revealed an overpayment of $1,215.75. This was the first time respondent's auditor, Mr. Mitchell, or anyone in its organization, knew of the overpayment. It is true, as contended by appellant herein, that Mr. Mitchell had been respondent's auditor since 1949 or 1950, and that the books in question from which the overpayments were discovered were at all times in the possession of respondent. Mr. Mitchell admitted that an audit as of January, 1953 might have disclosed the same information which was disclosed in 1955. The same information was in respondent's books and in its possession during the entire period of time and the books were never in the possession of appellant, to the witness' knowledge. The overpayment re-

sulted from respondent's failure to carry forward certain costs from the Dr. Ross series of broadcasts to the new series.

There was introduced into evidence, as respondent's Exhibit A, a document prepared by its accountant, Mr. Mitchell. This exhibit shows that the unrecovered production costs were in existence as of March 31, 1952, and that the overpayment commenced on May 15, 1952, when respondent issued a check to appellant as payment of the latter's share of profit for the month of April, 1952.

The court found that, "It is true that the defendant, through mistake and inadvertence, failed to deduct the sum of $1,215.75, as deductible costs, as defined and provided in said agreement of December 21, 1950. It is true that plaintiff's auditor discovered the error and overpayment while making an audit of defendant's books and records in September and October of 1955," and ordered judgment that respondent recover from appellant on the former's counterclaim the sum of $1,215.75.

Appellant's sole contention is that since action was not commenced within three years after inception of the cause of action, it is barred by the provisions of subdivision 4 of section 338 of the Code of Civil Procedure, which provides for a three-year limitation upon, "An action for relief on the ground of fraud or mistake. The cause of action in such case not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake."

Respondent first contends that the record on appeal fails to show that the alleged bar of the statute of limitations to the counterclaim was ever raised by appellant and therefore, the latter must be deemed to have waived any such defense. That appellant failed to raise the issue by demurrer and that "no mention was made of this alleged defense at the time of trial either by motion to strike the counterclaim or by objection to the receipt of any evidence to support the counterclaim or in any manner whatsoever." We are not in accord with respondent's contention. Subsequent to the filing of respondent's brief, this court, pursuant to stipulation of the parties, ordered the record augmented by including therein the pretrial order made in the trial court, which discloses the following:

"With reference to the counterclaim contained in the answer of the Defendant it is the contention of the Plaintiff . . . (e) that any cause of action for monies expended by Commodore

Productions and Artists, Inc. under the Lewis contract is barred by the statute of limitations." Also, on March 26, 1957, prior to the trial, there was filed by respondent herein, a memorandum entitled, "Defendant's Points and Authorities" wherein appears the following: "5. Is the counterclaim barred by the Statute of Limitations?" together with a discussion of the law and citation of cases concerning the claimed bar of the counterclaim. ■ We are satisfied that while, as contended by respondent, the statute of limitations is a special defense, personal in its nature, which may be waived or asserted, and that the party relying on it must affirmatively set it up in his pleading either by demurrer or answer, or it will be deemed to have been waived, there is however, another rule which is applicable with regard to the plea of the bar to counterclaims. This rule has developed because of section 462 of the Code of Civil Procedure, which as was said in *Union Sugar Co.* v. *Hollister Estate Co.*, 3 Cal.2d 740, 745 [47 P.2d 273], may be stated as follows: "Where the answer to a complaint sets up new matter constituting an affirmative cause of action or counterclaim, such new matter is deemed controverted under the provisions of section 462 of the Code of Civil Procedure, and the adverse party may, without formal plea, show that the attempted defense is barred by the statute of limitations, that statute being deemed pleaded by operation of law. (Citing cases.)" ■ In the case at bar, it is manifest that appellant invoked the plea at the trial and the trial court made a finding on the plea thus presented. We therefore conclude that the statute was sufficiently pleaded, was relied upon by appellant as a defense to the counterclaim, was entertained by the trial court and a finding made thereon. (See also *Hermosa Beach etc. Co.* v. *Law Credit Co.*, 175 Cal. 493, 495 [166 P. 22]; *Pacific Improvement Co.* v. *Maxwell*, 26 Cal.App. 265, 268-269 [146 P. 900]; *Jones* v. *Peck*, 63 Cal.App. 397, 408 [218 P. 1030].) The cases of *California Employment Com.* v. *MacGregor*, 64 Cal.App.2d 691, 693 [149 P.2d 304]; and *Bliss* v. *Sneath*, 119 Cal. 526, 527-529 [51 P. 848], relied upon by respondent are readily distinguishable from the situation presented by the record herein. Since no pleading to a counterclaim is required, appellant was entitled to raise the statute of limitations as a defense to respondent's counterclaim without formal plea, the statute being deemed pleaded as to a counterclaim by operation of law.

██ We come now to a consideration of the reasons advanced by appellant why respondent's counterclaim herein is barred by the statute of limitations. It is the contention of appellant that since the overpayment which was the subject of the counterclaim occurred in 1952, and might have been discovered by respondent as early as 1953 and the counterclaim was not filed until September 11, 1956, respondent cannot avoid the statute. Appellant argues that the books and records of respondent which would have revealed the overpayment were at all times in the possession of respondent and therefore, respondent was at all times chargeable with actual knowledge of what its books would reveal. It is further urged by appellant that since respondent had the means of uncovering the true facts and, since in any event means of knowledge is equivalent to knowledge, the counterclaim is barred by the provisions of section 338, subdivision 4 of the Code of Civil Procedure. Appellant relies heavily upon the case of *Shain* v. *Sresovich,* 104 Cal. 402 [38 P. 51], which involved an action to recover an overpayment made to defendant by plaintiff's assignors. Plaintiff's assignors and defendant were engaged in a joint venture for the importation and sale of oranges. On July 1, 1886, plaintiff presented to defendant a statement showing an indebtedness to defendant in excess of $2,000 and paid the same. These accounts were kept by plaintiff's assignors in one of their firm books, and the statement of account was prepared by them. The books were stored away until 1890, and in 1891 plaintiff's assignors discovered the error; that they had paid $630 too much. An action was brought on May 5, 1891.

The plaintiff maintained that he was not barred by the three-year period of limitations in an action for relief on grounds of mistake because section 338, subdivision 4, Code of Civil Procedure, provided that the cause of action is not deemed to commence until discovery. ██ In the cited case the court stated at page 405, "The rule is well established that the means of knowledge is equivalent to knowledge, and that a party who has the opportunity of knowing the facts constituting the fraud of which he complains cannot be supine and inactive, and afterwards allege a want of knowledge that arose by reason of his own laches or negligence . . . .

"Applying the above rule to the present case, we are of the opinion that the plaintiff's assignors had at all times after **the** payment to the defendant such means of information

with reference to the account between them and him, and of the mistake in the payment, that their failure to avail themselves of it charged them with the same result as though they had actual knowledge thereof. The accounts were kept under their supervision, or by their bookkeeper; the statement was made out by him; the book in which the account was kept, and from which the statement was presumably made, was retained by them, and was afterwards used by them in which to place their own individual transactions, and was afterwards stored away by them. It is not claimed that the defendant ever saw the book, or took any part in the preparation of the statement, or that he sustained any relation to them which entitled them to rely upon any statement of his, or that he made any statement or did any act which induced them to make the payment. Under these circumstances they are not entitled to claim that the 'discovery' of the mistake was within three years of the commencement of the action.'' To the same effect is the case of *Lady Washington C. Co.* v. *Wood,* 113 Cal. 482, 487 [45 P. 809], and *Merchants Ice etc. Co.* v. *Globe Brewing Co.,* 78 Cal.App.2d 618, 624, 625 [177 P.2d 963].

██ Respondent places great reliance upon the case of *Hobart* v. *Hobart Estate Co.,* 26 Cal.2d 412, wherein, at pages 437 to 439 [159 P.2d 958], the court stated: ''It is not in every case, however, that a person is barred after three years by failure to pursue an available means of discovering possible fraud. The statute commences to run only after one has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry. Section 19 of the Civil Code provides: 'Every person who has actual notice of circumstances *sufficient to put a prudent man upon inquiry* as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such facts.' (Italics added.) Under this section it was held in *Tarke* v. *Bingham,* 123 Cal. 163 [55 P. 759], that the plaintiff was not barred by subdivision 4 of section 338 of the Code of Civil Procedure, since nothing had occurred 'to excite his suspicion, or to put him upon inquiry.' (123 Cal. at p. 166.) The court said: 'Where no duty is imposed by law upon a person to make inquiry, and where under the circumstances ''a prudent man'' would not be put upon inquiry, the mere fact that means of knowledge are open to a plaintiff, and he has not availed himself of them,

does not debar him from relief when thereafter he shall make actual discovery. *The circumstances must be such that the inquiry becomes a duty, and the failure to make it a negligent omission.'* (Italics added.) Many other decisions have adopted this view. (Citing cases.) In many cases it has been said that means of knowledge are equivalent to knowledge. (Citing cases.) This is true, however, only where there is a duty to inquire, as where plaintiff is aware of facts which would make a reasonably prudent person suspicious. In the Lady Washington case, the court said (113 Cal. at p. 487) that 'as the means of knowledge are equivalent to knowledge, *if it appears that the plaintiff had notice or information of circumstances which would put him on an inquiry* which, if followed, would lead to knowledge, or that the facts were presumptively within his knowledge, he will be deemed to have had actual knowledge of these facts.' (Italics added.)''

It is noteworthy that in the Hobart case the court cited and quoted from *Lady Washington C. Co.* v. *Wood, supra*; *Shain* v. *Sresovich, supra,* and *Tarke* v. *Bingham,* 123 Cal. 163 [55 P. 759], relied upon by appellant herein, but nowhere in the Hobart case does the court criticize or disapprove the holding in *Lady Washington C. Co.* v. *Wood, supra,* page 487, that means of knowledge are equivalent to knowledge and that when ''. . . the facts were presumptively within his knowledge he will be deemed to have had actual knowledge of these facts,'' and at page 488, ''The Plaintiff ought not now be permitted to say that it did not discover the transactions when they were spread at large upon its records and books of account.'' As we view the Hobart case, *supra,* it simply holds that if the circumstances were such as to charge respondent herein with a duty to inquire by reason of its awareness of suspicious facts then it would be charged with actual knowledge. However, the Hobart case does not hold that where as here, the facts were presumptively within respondent's knowledge because its own books, in its possession at all times, disclosed the fact that it had unilaterally overpaid appellant in the sum of $1,215.75, respondent would not be deemed to have had actual knowledge of these facts. We therefore conclude that respondent had at all times after the overpayment to appellant such means of information with reference to the account between them, and of the mistake in the overpayment, that respondent's failure to avail

itself of it charged respondent with the same result as though it had actual knowledge thereof. If respondent could prevail on its counterclaim under the facts here present there is no limit to the time in which an action for restitution might be commenced. As was said in *Shain* v. *Sresovich, supra,* at page 406, "It would be a new proposition in mercantile life, as well as in law, if we should hold that a merchant who, many years after he had retired from business, on looking over his account-books through curiosity, should find that his bookkeeper had made a mistake in the account of one of his customers, could recover from the customer for the merchandise that had been omitted from his account through such mistake, or get back from him the money which he had paid upon a settlement with him."

For the foregoing reasons, that portion of the judgment that defendant recover on its counterclaim from plaintiff the sum of $1,215.75 is reversed with directions to the court below to enter judgment that defendant take nothing on its counterclaim. In all other respects the judgment is affirmed. The parties will bear their respective costs on appeal.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied February 18, 1959, and appellant's petition for a hearing by the Supreme Court was denied March 25, 1959.